# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8119 | **DATE** | 9/2/2003 |
| **CASE TITLE** | Sears, Roebuck & Co. vs. Emerson Electric Co. | | |

**MOTION:**   [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  Plaintiff Sears Roebuck & Co.'s motion for partial summary judgment [28-1] is granted.  Defendants Emerson Electric Co's motion for summary judgment [33-1] is denied.  Emerson must defend and indemnify Sears in current and future claims based upon alleged defects in Emerson-manufactured radial arm saws sold by Sears.  Sears may recover for expenses it has incurred in investigating, defending and settling such claims.  Status hearing is set for 10/2/03 at 9:30 a.m. to discuss the upcoming trial on damages.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 0 3 2003 | 49 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | 9/2/2003 | |
| MD | courtroom deputy's initials | 03 SEP -2 PM 4:10 | date mailed notice | |
| | | FILED FOR DOCKETING | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

)
SEARS ROEBUCK & CO.,                        )
)
    Plaintiff,                                  )
)
    vs.                                         )    No. 01 C 8119
)    Judge Joan H. Lefkow
EMERSON ELECTRIC CO.,                        )
)
    Defendant.                                  )
)

**DOCKETED**
**SEP 03 2003**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sears Roebuck & Co. ("Sears"), filed this action against defendant, Emerson

Electric Co. ("Emerson"), seeking both damages and declaratory relief for Emerson's failure to

defend and indemnify Sears pursuant to a contract entered into between the parties. Before the

court are the parties' cross motions for summary judgment. Sears is a New York corporation

with its principal place of business in Hoffman Estates, Illinois. Emerson is a Missouri

corporation with its principal place of business in St. Louis, Missouri. The amount in

controversy exceeds $75,000. The court, therefore, has diversity jurisdiction over the claims

under 28 U.S.C. § 1332(a)(1). For the reasons set forth below, Sears's motion for partial

summary judgment is granted while Emerson's motion for summary judgment is denied.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## FACTS[1]

On April 6, 1968, Emerson and Sears entered into an agreement (the "Supply Agreement") whereby Emerson agreed to sell certain tools to Sears, including 8-1/4", 9", 10" and 12" radial arms saws. (Pl. L.R. 56.1 ¶ 6.) Sears then sold these tools under its "Craftsman" name at its stores. (Pl. L.R. 56.1 ¶ 7.) As part of the Supply Agreement, Emerson agreed to

> protect, defend, hold harmless and indemnify Sears from and against any and all liability and expenses resulting from any alleged or claimed defect in product,

---

[1]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

2

whether latent or patent, including allegedly improper construction and design, or from the failure of product to comply with specifications or with any express or implied warranties of [Emerson] or arising out of the alleged violation by product or in its manufacture or sale of any statute, ordinance or administrative order rule or regulation.

(Pl. L.R. 56.1 ¶ 9.)

The parties amended the agreement on January 1, 1985 (the "1985 Amendment") and agreed that Emerson would "have the same obligations of defense and indemnity with respect to [Sears] as those of an insurance carrier under the law of Illinois." (Pl. L.R. 56.1 ¶ 10.) As part of the 1985 Amendment the parties further agreed that

[Emerson] shall be obligated to defend, protect, hold harmless and indemnify, in accordance with the Indemnity Provision [in the Supply Agreement] and this Agreement, the entirety of any claim, action, liability, loss, judgment, settlement, cost or expense, so long as it involves, contains or includes, in whole or part, any allegation as described in the Indemnity Provision [in the Supply Agreement] or this Agreement and said obligations shall continue until such time, if any, as the claim, action, liability, judgment, settlement, loss, cost or expense is limited solely to matters other than those described in the Indemnity Provision [in the Supply Agreement] or this Agreement. Nothing contained in the Contract of Purchase of this Agreement shall be construed to require [Emerson] to hold harmless or indemnify [Sears] for product liability claims arising from matters excluded by the following:
(a)     any express warranty unauthorized by [Emerson];
(b)     bodily injury or property damage arising out of:
    (i)  any physical or chemical change in the form of the products sold by [Emerson] to [Sears] made intentionally by [Sears],
    (ii)  repacking, unless repacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer and then repacking in the original container,
    (iii)  demonstration, installation, servicing or repair operations, except such operations performed at [Sear's] premises in connection with the sale of said products, or
    (iv)  products which after distribution or sale by [Emerson] have been labeled or relabeled or used as a container, part or ingredient of any other things or substance by or for [Sears].

(Pl. L.R. 56.1 ¶ 11.)

Beginning in January 1993, all of the radial arm saws manufactured by Emerson and sold by Sears (with the exception of the 12" saws) did not contain a "Lower Blade Guard" as part of its guarding system. (Def. L.R. 56.1 ¶ 26.) Instead, these radial arm saws contained a "Metzger Guard," which was designed to address injuries suffered by users in the "rip-cut method." (*Id.*) As part of Emerson and Sears's joint defense in law suits involving their saws, both parties represented that the decision not to offer a Lower Blade Guard as standard equipment was reasonable and made in good faith. (Def. L.R. 56.1 ¶ 19.) Sears's witnesses have also testified, relying on representations by Emerson, that the presence of a Lower Blade Guard on Emerson radial arm saws may, under certain circumstances, introduce additional hazards to the operator. (Pl. Resp. to Def. L.R. 56.1 ¶ 19.)

In 1997 Sears decided to put its power tool business, including the Craftsman line formerly assigned to Emerson, out for bid. (Def. L.R. 56.1 ¶ 35.) Emerson was invited to participate in the bidding process as were other companies, including Ryobi North America ("Ryobi"). (Def. L.R. 56.1 ¶ 35.) With respect to its radial arm saw product line, Sears ultimately decided to buy the product from Ryobi beginning in September 1998. (Def. L.R. 56.1 ¶ 36.) Thus, on June 30, 1997, Sears terminated the Supply Agreement with Emerson. (Pl. L.R. 56.1 ¶ 12.)

On October 31, 1997, Sears and Emerson entered into an agreement that was intended to resolve issues arising out of the termination by Sears, effective September 30, 1998 (the "Termination Agreement"). (*Id.*) As part of the Termination Agreement, both parties agreed that certain obligations of the Supply Agreement would survive the Termination Agreement and

4

continue past September 30, 1998, including Emerson's indemnity and duty to defend obligations. (*Id.*)

In December 1998 Sears began offering for sale, under the Craftsman name, Ryobi-manufactured 10" radial arm saws that came equipped with Lower Blade Guards.[2] (Pl. L.R. 56.1 ¶ 13; Def. L.R. 56.1 ¶ 47.) After Sears began offering the Ryobi products with the Lower Blade Guard, the litigation strategies of Emerson and Sears in law suits involving the Metzger Guard (*i.e.*, that the saws without a Lower Blade Guard were not unreasonably dangerous and the Metzger Guard provided more safety) were attacked in injury law suits as being a sham. (Def. L.R. 56.1 ¶ 53.)

Emerson, facing a dilemma of how to defend these law suits in the face of Sears's abandonment of the Metzger Guard, shortly thereafter advised Sears that it believed Sears's conduct in offering a Lower Blade Guard on the Ryobi products was in irreconcilable conflict with the joint defense of Emerson and Sears in cases involving the safety of the Metzger guard. Emerson further advised Sears that its actions had breached Sears's duty of good faith and fair dealing, breached Sears's duty to cooperate, and materially increased Emerson's risk as an indemnitor. (Def. Resp. to Pl. L.R. 56.1 ¶ 14.) Emerson informed Sears that it would no longer defend or indemnify Sears with respect to those radial arm saw cases where the Lower Blade Guard was at issue. (*Id.*) Emerson also advised Sears that because, in Emerson's view, it has no duty to defend or indemnify Sears with respect to Sears's own conduct, the defense of Sears's

---

[2] Emerson believes that the use of the Metzger Guard results in a safer product as compared to a product with a Lower Blade Guard because of its belief that "rip-cut" method injuries occur most frequently. (Def. L.R. 56.1 ¶¶ 14, 19.) Sears asserts that the Lower Blade Guard used on Ryobi manufactured products provides protection in "cross-cut" method injuries in addition to also providing protection in the "rip-cut" method. (Pl. Resp. to Def. L.R. 56.1 ¶ 13.)

adoption of the Ryobi Lower Blade Guard in cases involving Emerson saws is Sears's responsibility.[3]  (*Id.*)

## DISCUSSION

Sears seeks partial summary judgment on grounds that the contracts it entered into with Emerson unambiguously and unconditionally require Emerson to defend and indemnify Sears with respect to the Emerson-manufactured radial arm saws.  Sears asks the court to declare that Emerson must defend and indemnify Sears in current and future claims based on alleged defects in the Emerson-manufactured radial arm saws sold by Sears and reimburse Sears for expenses it has incurred in investigating, defending and settling such claims.

Emerson contends that summary judgment is appropriate in its favor and that it is not required to defend or indemnify Sears with respect to the Emerson-manufactured saws in cases in which the Lower Blade Guard is at issue because (1) Sears has materially increased Emerson's risk, which voids the indemnity agreement; (2) Sears has no entitlement to indemnity for its own acts, and liability based on Sears's adoption of the Ryobi Lower Blade Guard is Sears's sole responsibility; and (3) Sears's conduct breaches its duty of good faith cooperation.

---

[3]The court previously entered an order staying discovery in this case pending ruling on the motions for summary judgment. (*See* Docket entry # 29.) The court accepted for purposes of that discovery motion that some actions which substantially increase an indemnitor's risk might be found to breach a contractual duty of good faith implied by Illinois insurance law. But the court opined that such a scenario was extremely unlikely because the interests of an indemnitor and indemnitee are typically aligned in this respect. Moreover, the court noted that there was no scenario it could imagine where Sears would adopt an unsafe guarding system for the bad faith purpose of increasing the liability to Emerson, but did leave open the possibility that Emerson could present an inference of such proof through affidavits in opposition to Sears's motion for summary judgment.

Insofar as the various contracts the parties entered into clearly provide that Emerson is to defend and indemnify Sears, the court will examine Emerson's arguments to determine whether they otherwise justify departure from the contractual language.[4]

## A.    Materially Increased Risk

Emerson first relies on what it calls the "universal rule" that actions by an indemnitee which materially increase the risk to an indemnitor void any indemnity agreement. *See, e.g.,* *Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 732, 743 (W.D. Ohio. 1999). According to Emerson, Sears has materially increased the risk to Emerson because Sears's switch to Ryobi's products using the Lower Blade Guard system undermines the joint defense previously advanced by both Sears and Emerson and has impaired Emerson's ability to continue to assert that a radial arm saw without a Lower Blade Guard is safe. Sears, in response, argues that this materially increased risk defense has not been recognized in Illinois. Sears claims that for Emerson to prevail the court would not only have to first recognize this "new" materially increased risk defense under Illinois law, but also accept its application in circumstances where the basis of the increased risk is only the indemnitee's decision to switch to products with different safety features that are in no way covered by the indemnification agreement at issue. Sears maintains that allowing an indemnitor to escape its indemnification obligations based only on the indemnitee's offering products with new or different safety features "would be bad law and worse policy."

---

[4]Neither party addresses what law governs this diversity action, so the court will apply Illinois law. *See, e.g.*, *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal courts sits.").

While no Illinois case is cited directly applying the material increased risk rule in an indemnity setting, two cases recognize it in some form.[5] *See Windowmaster Corp.* v. *Morse/Diesel, Inc.*, 722 F. Supp. 1532, 1534 (N.D. Ill. 1988) and the later opinion in the same case in *Rush Presbyterian St. Luke's Med. Center* v. *Safeco Ins. Co.*, 712 F. Supp. 1344, 1345-46 (N.D. Ill. 1989) (in denying dismissal of a claim that a surety had breached a duty of good faith when it settled with the obligee, reasoning that an insured (surety) owes a duty of good faith to its insurer); *Merchandise Nat'l Bank of Chicago* v. *Kolber*, 50 Ill. App. 3d 365, 370, 365 N.E. 2d 688, 693 (1977) (noting that an indemnitee's failure to raise a valid defense that prejudiced the indemnitor could void an indemnity, but on the facts concluding that the defense in question would not have been valid in any event). The *Windowmaster Corp.* and *Rush Presbyterian* opinions found an obligation to the insured based on the duty of fair treatment. 722 F. Supp. at 1534. In both opinions the court relied on *Cernocky* v. *Indemnity Ins. Co. of N. Am.*, 69 Ill. App. 2d 196, 207, 216 N.E. 2d 198, 204 (1966), noting that an insured has a duty "to act honestly and in good faith toward the insured."

As this court stated in ruling on Sears's motion to stay discovery, even if it were to assume that under certain circumstances Illinois law would void an indemnity agreement when some actions of an indemnitee substantially increased the indemnitor's risk and thereby breached a contractual duty of good faith implied by Illinois law, this rule is not properly applied in the situation presently before the court unless Emerson were to proffer a scenario in which Sears's

---

[5]Emerson believes this rule has its roots in the analogous area of guaranty law, where an action that materially increases the risk to a guarantor voids any guaranty. *See, e.g., Bernardi Bros., Inc.* v. *Great Lakes Distrib., Inc.*, 712 F.2d 1205, 1207 (7th Cir. 1983); *McHenry State Bank* v. *Y & A Trucking, Inc.*, 117 Ill. App. 3d 629, 633, 454 N.E. 2d 345, 349 (1983). Sears, however, asserts that even in the guaranty setting an agreement is not voided unless the nature of the underlying obligation is fundamentally altered. *E.g., Alton Banking & Trust Co.* v. *Sweeney*, 135 Ill. App. 3d 96, 103, 481 N.E. 2d 769, 774 (1985).

motive could have been in bad faith. But such a scenario in which Sears adopts an unsafe guarding system and invites law suits against itself for the bad faith purpose of increasing the liability of Emerson is extremely unlikely. Despite staying discovery, the court allowed Emerson to demonstrate through affidavits in opposition to summary judgment that an issue of fact could be illustrated by discoverable evidence that Sears's motive was in bad faith. The court is not satisfied that Emerson has done so. Indeed, the evidence illustrates that Sears relied on representations by Ryobi that the Lower Blade Guard to be placed on the new products protected against injuries when used in both the "cross-cut" as well the "rip-cut" methods. (Pl. L.R. 56.1 ¶¶ 44-47.)

Moreover, while Emerson cites cases from other jurisdictions which have applied the materially increased risk principle, in those cases the rule was applied where indemnitees altered the underlying contract, made misrepresentations on which the indemnitor relied, or failed to exercise diligence in fulfilling the indemnitee's responsibilities under the indemnity contract, thereby increasing the indemnitor's risk. Those situations did not address anything comparable to that presented here, where a retailer/indemnitee's mere switch to products with different safety features that are not covered by the indemnification agreement resulted in a materially increased risk and ultimate loss of the retailer's indemnification rights. As Sears points out, the underlying contract in question in this case has not changed and nothing in the indemnification agreement requires Sears to freeze either the supplier of its saws or the safety features it will offer in the future. Furthermore, in practice this rule would discourage innovation and safer products and encourage a retailer/indemnitee to freeze safety features for products subject to indemnification agreements, even if newer products would offer greater safety, because to do otherwise would

9

increase the supplier's risk in products liability suits. The court agrees with Sears that this would be "bad law and worse policy" and rejects Emerson's argument on this ground also.

## B.     Indemnity for Own Acts

Emerson next argues that it is not required to indemnify Sears for its own acts, and that liability based on Sears's adoption of the Ryobi Lower Blade Guard falls within Sears's own acts and is Sears's sole responsibility. Emerson points out that under Illinois law "an indemnity contract will not be construed as indemnifying one against his own negligence unless such intention is clearly and explicitly or unequivocally addressed in the contract." *Hankins* v. *Pekin Ins. Co.*, 305 Ill. App. 3d 1088, 1093, 713 N.E. 2d 1244, 1248 (1999). Emerson asserts that the plain meaning of both the Supply Agreement and the 1985 Amendment supports its view, as does the parties' course of dealing, which Emerson advances to clarify what the parties believed their contract meant. *E.g., Scott* v. *Assurance Co. of Am.*, 253 Ill. App. 3d 813, 818, 625 N.E. 2d 439, 443 (1993) ("even without a written contract being ambiguous, a course of dealing between the parties is admissible to explain, supplement, or add to the agreement (but not contradict it).").

Emerson claims that the most specific example of Sears accepting responsibility for its own actions took place in 1986, when Sears launched a major advertising campaign to promote home use of the 12" radial arm saw. This advertising campaign conflicted with the joint defense of Sears and Emerson which required that 10" and 12" radial arm saws be marketed in a different fashion. Emerson states that after Sears was informed of the conflict it agreed to abandon its advertising program in the interests of the joint defense and accepted financial responsibility and a fair allocation of liability for its own acts. Emerson also states that many other scenarios exist in which Emerson tendered the defense of cases back to Sears when in Emerson's judgment the

10

cases involved claims pertaining to Sears's conduct. (Def. L.R. 56.1 ¶ 8.) Emerson maintains

that most of these cases fall outside the exceptions to indemnity listed in the 1985 Amendment,

including the 1986 advertising case listed above and a series of cases in which Sears allegedly

spoiled evidence necessary to the joint defense. (*Id.*) In response, Sears argues that the instances

in which it agreed to take responsibility for its own actions were more a product of its desire not

to engage in legal battles with its suppliers, with whom Sears wishes to maintain positive

relationships and avoid litigation, than acknowledgment of responsibility for its own acts.

To the extent that Emerson claims that the plain language of the contracts between the

parties fails to expressly indemnify Sears for its own negligence, its argument is without merit.

While true that indemnity for one's own negligence must be clearly and explicitly stated, "[i]t is

not necessary that specific reference to indemnification against liability arising out of the

indemnitee's negligence be provided for in the agreement." *Ahlvers* v. *Terminal R.R. Assoc. of

St. Louis*, 31 Ill. App. 3d 166, 171, 334 N.E. 2d 329, 333 (1975); *Duffield* v. *Marra, Inc.*, 166 Ill.

App. 3d 754, 765, 520 N.E. 2d 938, 945 (1988). Instead, general reference to "any and all"

claims, losses or injuries will "be construed as indicating an intention by the parties that the

indemnitee be indemnified for damages resulting from the indemnitee's own negligence."

*Economy Mech. Indus., Inc.* v. *T.J. Higgins Co.*, 294 Ill. App. 3d 150, 155, 689 N.E. 2d 199, 202-

03 (1999). *See also, Ahlvers*, 31 Ill. App. 3d at 171, 334 N.E. 2d at 333; *Rios* v. *Field*, 132 Ill.

App. 2d 519, 522, 270 N.E. 2d 98, 101 (1971). Here the Supply Agreement states that Emerson

was to "protect, defend, hold harmless and indemnify Sears from and against *any and all* liability

and expense resulting from any alleged or claimed defect in product . . . ." (emphasis added).

Similarly, in the 1985 Amendment Emerson agreed to indemnify Sears "in accordance with" the

11

Supply Agreement. This language indemnifying Sears for "any and all" liability resulting from Emerson's products is sufficiently broad to include indemnity for Sears's own actions. Thus, Emerson's claim that the plain language of the Supply Agreement and the 1985 Amendment supports its view must fail.

The court similarly rejects Emerson's argument that the parties' course of performance can illustrate their intention that Emerson not be required to indemnify Sears for its own acts. While true that Illinois law provides that the parties' course of performance may explain, supplement, or add to an agreement, the course of performance may not be used to contradict any contract entered into. *Scott*, 253 Ill. App. 3d at 818, 625 N.E. 2d at 443. The Supply Agreement is clear that Emerson was to indemnify Sears for "any and all" liability resulting from defects in the Emerson products, with the only exceptions to this duty being listed in the 1985 Amendment. To read the parties course of performance to otherwise exclude Sears's own acts would not supplement or add to the agreement but would rather contradict it. Emerson's motion for summary judgment on this ground is denied.

## C.     Duty to Cooperate

Finally, Emerson maintains that Sears has breached its duty to reasonably cooperate in the defense of the radial arm saw cases. According to Emerson, this duty to cooperate stems from the broader duty of good faith and fair dealing implied in all contracts. Emerson apparently argues that both duties prohibit Sears from taking any action which would prevent Emerson from enjoying the benefit of its contract. Sears responds by stating that it did nothing to interfere with Emerson's enjoyment of the benefit of its contract with Sears. Moreover, Sears argues that the duty to cooperate imposes only limited obligations which Sears has entirely fulfilled.

12

The Seventh Circuit has recognized that a contractual duty of cooperation requires an insurer to (1) provide relevant records; (2) make a reasonable reconstruction of the events surrounding a claim; (3) attend depositions and other legal proceedings; (4) provide truthful testimony at trial; (5) make reasonable efforts to obtain the cooperation of witnesses with helpful knowledge; (6) sign any papers required in connection with the claim; and (7) attend the trial or hearing on the matter. *Employers Ins. of Wausau* v. *James McHugh Constr. Co.*, 144 F.3d 1097, 1105 (7th Cir. 1998). Emerson argues that Sears has not made itself available to be a witness because its conduct makes it impossible for any Sears witness to give untainted testimony. Emerson cites no case, however, in which the failure to make a witness available stemmed from the witness's unfavorable testimony and not from the failure to appear at trial. *E.g.*, *Wallace* v. *Woolfolk*, 312 Ill. App. 3d 1178, 1179, 728 N.E. 2d 816, 818 (2000) ("An insurer is not liable for a judgment rendered against its insured if the insured willfully failed to cooperate by refusing to appear at trial after receiving adequate notice."). There is no evidence in the record to support the notion that Sears has failed to present witnesses at trial.

As for Emerson's broader argument that the duty of cooperation and the duty of good faith and fair dealing prohibit Sears from taking any action which would prevent Emerson from enjoying the benefit of its contract, this argument is also rejected. Emerson cites *UNR Indus., Inc.* v. *American Mut. Liab. Ins. Co.*, 92 B.R. 319, 336 (N.D. Ill. 1988), for the proposition that the duty of good faith and fair dealing "requires both parties to treat the other party fairly and to give at least as much consideration to the other party's welfare as it gives to its own interests." The court in *UNR*, however, further stated that "this explanation of the duty is useless without a definition of its scope," and clarified that parties must deal fairly and honestly with one another

13

when performing the terms and obligations of the contract. *Id.* Sears has not acted unfairly or dishonestly with respect to its performance of its obligations to Emerson. The Termination Agreement provided that Emerson's obligation to defend and indemnify Sears for defects in Emerson's products survived the termination of the business relationship. It did not otherwise restrict Sears's actions afterwards. Thus, in spite of the obvious magnification of exposure for Emerson under the indemnity agreements, the court does not agree that either the duty of cooperation or the duty of good faith and fair dealing has been violated.[6]

## CONCLUSION

For the reasons stated above, Sears's motion for partial summary judgment is granted [#28] while Emerson's motion for summary judgment is denied [#33]. Emerson must defend and indemnify Sears in current and future claims based on alleged defects in Emerson-manufactured radial arm saws sold by Sears. Moreover, Sears may recover for expenses it has incurred in investigating, defending and settling such claims. This case will be called for status on October 2, 2003 at 9:30 a.m. to discuss the upcoming trial date on damages. In the meantime, the parties are urged to meet in an effort to resolve this case short of trial.

Enter: _Joan H. Lefkow_
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 2, 2003

---

[6]Nor does the court find persuasive Emerson's citation to *Industrial Sugars, Inc.* v. *Standard Acc. Ins. Co.*, 338 F.2d 673 (7th Cir. 1964). There the court held that the insured, who knew that some products it had sold were contaminated but did not notify the buyer of the goods, had caused the misconduct in question by intentionally withholding the information "to take a chance that the contamination would not be discovered and then impose the loss upon the insurer when the gamble failed . . . ." *Id.* at 675-76. The court found that this type of "intentional misconduct" voided the contract. *Id.* at 676. As stated throughout this opinion, the court does not believe that even an inference of such intentional misconduct or bad faith has been established here.

14